## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MICHAEL THOMPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-CV-1495-GCS** |
| | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| **DR. STEPHEN RITZ, JOHN TROST,** | ) | |
| **and FRANK LAWRENCE,** | ) | |
| | ) | |
| **Defendants.[1]** | ) | |

## MEMORANDUM and ORDER

**SISON, Magistrate Judge:**

### INTRODUCTION AND BACKGROUND

Pending before the Court are Defendants' motions for summary judgment. (Doc. 106, 110).[2] As of this date, Thompson *only* responded to the motion for summary judgment filed by Defendants Trost, Ritz, and Wexford Health Sources, Inc. ("Wexford"). Based on the reasons delineated below, the Court **GRANTS** the motion for summary

---

[1]      Jacqueline Lashbrook is no longer the Warden of Menard. Frank Lawrence is currently the Acting Warden of Menard. Pursuant to Federal Rule of Civil Procedure 25(d), Frank Lawrence is substituted in place of Jacqueline Lashbrook.

[2]      Pursuant to Federal Rule of Civil Procedure 56, *Timms v. Frank*, 953 F.2d 281 (7th Cir. 1992) and *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir. 1982), Defendants filed the required notice informing Thompson of the consequences of failing to respond to the motions for summary judgment. (Doc. 108, 112).

judgment filed by Trost, Ritz and Wexford and **FINDS as moot** Lawrence's motion for summary judgment.

Plaintiff Michael Thompson, an inmate in Menard Correctional Center ("Menard") brought this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. Thompson contends officials at Menard were deliberately indifferent to his serious medical condition (Crohn's disease). The following allegations are taken from Thompson's complaint. Thompson arrived at Menard in November 2008. (Doc. 1, p. 2). He informed medical staff he suffered from Crohn's disease and took medication for the disease. *Id.* Thompson explained that one of his medications, Remicade, was critical for controlling the flare-ups associated with his condition and preventing his disease from escalating. *Id.* Medical staff did not prescribe Remicade. *Id.* Instead, Thompson was treated with a less effective medication that barely addressed his pain and never alleviated the symptoms of his condition. *Id.* Over the next eight years, medical staff ignored Thompson's medical needs associated with his condition and continued to provide only ineffective treatment options. *Id.* at p. 2-3.

Thompson alleges the inadequate medical care exacerbated his symptoms and escalated the disease. (Doc. 1, p. 3). Specifically, he states the severity of the following symptoms increased: (1) bloating; (2) stomach cramps/spasms; (3) vomiting; (4) body aches; (5) hot and cold sweats; (6) loss of sleep; (7) loss of appetite; and (8) severe weight loss (from 190 to 135 lbs.) *Id.* Thompson contends the ineffective treatment was the equivalent of providing no medical care whatsoever. *Id.* at p. 2-3.

In 2015, Thompson stayed in the infirmary at Menard's Healthcare Unit on two occasions and was hospitalized at outside facilities (Chester Hospital and Carbondale Hospital) on two occasions for severe flare-ups. (Doc. 1, p. 3). Specialists at Carbondale hospital indicated that Thompson's condition was severe and recommended specific follow-up treatment, including surgery. *Id.* The specialists told Thompson his condition had deteriorated so much that further treatment would be ineffective and surgery was the only option. *Id.* Dr. Trost ignored the recommendations, took no action, and refused to appeal the Collegial Review Board's denial of Thompson's request for surgical treatment.

On April 19, 2016, Thompson was taken to an outside hospital for an emergency surgery that required removal of a significant portion of his large intestine. (Doc. 1, p. 3). This led to a bladder infection that caused waste to be excreted through his urethra. *Id.* Following the April 2016 surgery, Thompson was advised it would take six months to reverse the operation and remove the colostomy bag. *Id.* Before that could happen, in October 2016, Plaintiff was taken to an outside hospital for a second emergency surgery. *Id.* This surgery was necessary because Thompson's small intestine had become strangulated (twisted in a knot), which resulted in that section of the small intestine being removed. *Id.* Thompson alleges his condition unnecessarily deteriorated, resulting in emergency surgeries and further injury due to the inadequate care provided by the Defendants.

On September 17, 2018, the Court performed a preliminary review of the complaint

pursuant to 28 U.S.C. § 1915A, and the following claims survived:

> **Count 1 –** Eighth Amendment claim for deliberate indifference to serious medical needs against Ritz, Feinerman, Shepherd, Fahim, Shearing, and Trost in relation to Plaintiff's Crohn's disease.

> **Count 2 –** Eighth Amendment claim for deliberate indifference against Wexford Health Sources, Inc. for instituting and following cost-saving policies and practices which delayed the provision of medical care, resulted in inadequate medical treatment, and caused Menard providers to fail to treat Plaintiff's Crohn's disease.

(Doc. 9, p. 3). Also, the Court added as a Defendant the Warden of Menard, in his or her official capacity, for the purposes of carrying out any injunctive relief ordered in this matter. *Id.* Thereafter, on June 4, 2019, Chief Judge Nancy J. Rosenstengel dismissed with prejudice the claims against Fahim, Feinerman, Shearing, and Shepherd as being barred by the statute of limitations. (Doc. 92).

### FACTS

The following facts are taken from the record and presented in the light most favorable to Thompson, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

Thompson has been incarcerated at Menard since 2007. Defendant John Trost, a licensed physician, was employed as the Medical Director at Menard from November 25, 2013 to March 17, 2017. Defendant Stephen Ritz, a Doctor of Osteopathic Medicine, has been employed by Wexford as the Corporate Utilization Management Director since September 2014. Defendant Wexford is a corporation that was contracted by the Illinois

Department of Corrections ("IDOC") to provide medical and dental services to inmates housed at Menard during all relevant times in this case.

Thompson testified that he was first diagnosed with Crohn's disease in 2003 and that he is aware that Crohn's disease is a condition that can worsen or become more severe over time. (Doc. 111-1, p. 5). He also testified that he does not recall any specific details regarding his appointments with medical staff. He did recall some of his medications as follows: "[n]ot all the visits, but as far as medication, it has been Sulfasalazine for the majority of the time up until 2016, Prednisone off and on during flare-ups, and I was given CIMZIA in 2016." *Id.*

On July 28, 2014, Thompson saw Trost for the first time for complaints of abdominal pain and watery diarrhea associated with having approximately 6 stools per day. Trost examined Thompson, noted Thompson's abdomen was soft and non-tender, and assessed that Thompson was experiencing a Crohn's disease exacerbation. Trost prescribed Prednisone 20mg and Tylenol 500mg for one month and ordered Thompson to return to the clinic in one to two weeks.

On August 11, 2014, Trost saw Thompson for a follow-up appointment and noted that Thompson's cramping had subsided and he was having semi-formed bowel movements. Trost examined Thompson, found Thompson's abdomen flat and non-tender, and assessed that Thompson's Crohn's symptoms had improved. Trost tapered off the Prednisone and ordered Thompson to return to the clinic in two weeks.

About a month later on September 4, 2014, Thompson was admitted to the

infirmary for a 23-hour observation for complaints of vomiting, diarrhea, and nausea. The next day, Thompson's blood was taken for a Complete Metabolic Panel ("CMP") and Complete Blood Count ("CBC"). Trost noted the need to pull Thompson's chart after reviewing his blood work.

On October 10, 2014, Thompson saw a Registered Nurse ("RN") for complaints of abdominal pain with bloody stools. Upon examination, Thompson showed expressions of pain with palpation of his abdomen. His abdomen was also distended and rigid. Trost was called, and he ordered Thompson to be sent to the Emergency Room.

From October 10-15, 2014, Thompson was at Memorial Hospital in Chester, Illinois ("Memorial Hospital"). While at Memorial Hospital, Thompson underwent a CT scan, an EGD (an endoscopic procedure to examine the esophagus, stomach, and the duodenum (part of small intestine)), and a colonoscopy. The EGD suggested a small gastric ulcer. The colonoscopy revealed perianal fistula and significant inflammation in the sigmoid colon with narrowing obstruction. Once his symptoms improved, the hospital doctor discharged Thompson and prescribed Azulfidine (generic: Sulfasalazine), Ferros Sulfate (iron sulfate) Prilosec, Prednisone, Vitamin C, and a multivitamin. Upon return to Menard, Trost prescribed the same medications and supplements.

On October 21, 2014, Thompson had blood work taken for a CBC. The next day, Trost reviewed the blood work, which showed some levels out of the normal range. Thompson was scheduled to see Trost for a follow-up. Trost saw Thompson on November 11, 2014. Thompson was feeling better and self-reported 2-3 non-bloody daily

bowel movements. Trost examined Thompson, found Thompson's abdomen soft and non-tender, and prescribed Hydrocaine lotion (for hemorrhoids). Trost also ordered CBC and CMP blood tests and instructed Thompson to return to the clinic in one month. Thompson's blood was drawn on November 17, 2014, and on November 19, 2014. Trost examined the blood work results, which showed some levels were out of normal range. Thompson was scheduled to be seen in the General Medicine Chronic Clinic ("GMCC") on November 21, 2014.

Thompson missed his appointments at the GMCC on November 21, 2014, and on November 24, 2014, due to late chow lines. Later that month, a Nurse Practitioner ("NP") did a jacket review of Thompson's chart and prescribed Prednisone 30mg daily for two weeks and then Prednisone 20mg daily for two weeks.

On December 7, 2014, Thompson saw an NP in the GMCC who noted that he had a recent Crohn's flare-up and that he was taking Prednisone. The NP prescribed Ferrous Sulfate and Prilosec and ordered a repeat of the CBC in two months. Five days later, Thompson saw Trost, and Thompson self-reported twice daily formed bowel movements without blood or abdominal pain. Trost examined Thompson, noted Thompson's abdomen was soft and non-tender, and ordered Thompson to return in two weeks.

Thompson saw Trost on December 12, 2014. Thompson reported twice daily formed bowel movements without blood or abdominal pain. Trost examined Thompson, found Thompson's abdomen soft and non-tender, and ordered Thompson to return in two weeks. Thompson next saw Dr. Fuentes on December 30, 2014. Thompson reported

twice daily formed bowel movements. Dr. Fuentes ordered Thompson to return to the clinic as needed.

A month later, an NP performed a jacket review of Thompson's chart and prescribed Ferrous Sulfate and Prilosec. Thereafter, Thompson had blood work taken for a CBC on February 5, 2015. This blood work showed that some of his levels were slightly out of normal range.

On March 3, 2015, Thompson saw an RN and reported that he had diarrhea six to eight times a day for three days. The RN referred him to a doctor. The next day, Dr. Fuentes saw Thompson. Thompson complained of diarrhea with no bloody stools. Dr. Fuentes noted that Thompson appeared hydrated and prescribed Imodium for three days and Prednisone 40mg daily for two months.

A month later, Thompson saw an RN and reported a Crohn's flare-up wherein he had diarrhea for three days. The RN referred him to a doctor. On April 7, 2015, Thompson had blood work drawn for a CBC. The blood work showed that some levels were slightly out of normal range, so Thompson was scheduled to see a doctor on April 10, 2015. Thompson saw Dr. Fuentes on that day. Thompson told Dr. Fuentes that he had not received his Sulfasalazine for one month and that he had diarrhea for four days. Dr. Fuentes prescribed Sulfasalazine for Thompson.

In July 2015, Thompson saw an RN for complaints of diarrhea he had been having for eight days. Trost gave the RN telephone orders prescribing Prednisone 30mg for two weeks and a follow-up appointment in two weeks. Over a month later on August 31,

2015, Trost saw Thompson and noted the need to refer him to Collegial Review for a gastroenterology ("GI") consultation. Additionally, Trost ordered a CBC, CMP, iron studies, and a two week follow-up. On September 8, 2015, Thompson had his blood work drawn for the CBC, CMP, and iron studies. The results showed that some of Thompson's levels were out of normal range.

On September 10, 2015, Trost presented Thompson at Collegial Review for a GI consultation. Trost explained that Thompson had Crohn's disease for 13 years, had 4 bowel movements a day, and required Prednisone on a near constant basis. Ritz approved the referral to the GI.

Four days later, Trost saw Thompson for complaints of increased abdominal pain and cramping associated with three soft, non-bloody daily bowel movements. Trost noted that Thompson had not had a colonoscopy in at least eight years and that Thompson previously took Remicade (biologic medication) with great results.

On October 6, 2015, Thompson had blood work taken again for a CBC. The blood work showed some levels were slightly out of normal range, and it was noted that Thompson needed to be seen again.

On October 16, 2015, Thompson saw Dr. McCain, who was a gastroenterologist. Dr. McCain noted that Thompson previously had been treated with Remicade and that he was currently taking Azulfidine. Dr. McCain recommended that Thompson start on a biologic agent (Remicade or Humira) that the correctional system would approve. Dr. McCain recommended that Thompson return in three weeks. Thereafter, on October 21,

2015, Trost referred Thompson to Collegial Review for a GI consultation with Dr. McCain and noted that Thompson was to receive Humira or Remicade per Dr. McCain's recommendations. The next day, Thompson was prescribed Sulfasalazine and a multivitamin for one year.

On October 30, 2015, Trost presented Thompson at Collegial Review for the GI appointment. Dr. Ritz denied the appointment and requested that Trost call Dr. McCain to obtain a Humira prescription that could be given to Thompson at Menard. Both Trost and Ritz agreed to the alternate treatment plan. Trost was to call Dr. McCain to tell him that Humira should be prescribed because it could be given to Thompson on site at Menard. The medical note indicated the need to revisit this issue in two weeks. As to this plan, Thompson testified that he had no complaints of being given his biologic medication injections at Menard instead of Dr. McCain's office. Specifically, Thompson testified as follows:

> Q.   Okay. Do you recall any complaints with his decision?
>
> A.   No.
>
> Q.   So do you believe that you needed to be given these injections at the GI's office?
>
> A.   Are you talking about as far as being given it here, or –
>
> Q.   Yes, being given it here at Menard, or given the shots at the GI's office.
>
> A.   Oh, I have no complaint.
>
> Q.   So no complaint being given it here.

A.   Correct.

Q.   Do you understand that there's a security risk every time an inmate leaves a facility?

A.   Correct.

Q.   And that requires a lot of coordination and staff to arrange and attend every outside visit?

A.   Correct.

Q.   So you understand that the prison would always prefer treatment that could be provided at the facility, versus outside treatment.

A.   Yes.

(Doc. 111-1, p. 10).

On November 3, 2015, Thompson saw an RN for complaints of flu-like symptoms consisting of vomiting with no blood. The RN noted that Thompson was awaiting Humira and told Thompson to notify the Health Care Unit ("HCU") if his symptoms worsened. The next day, Thompson refused the Nurse Sick Call ("NSC"). The RN noted that she received follow-up orders from Collegial Review via Trost's telephone order that Thompson was to start Humira. On November 5, 2015, Thompson saw an NP for a medical furlough follow-up. The NP noted that Thompson's abdomen was soft and flat with active bowel sounds and no tenderness or guarding.

It was noted on both November 9 and 10, 2015, that Humira was not given to Thompson because the HCU was awaiting a non-formulary approval from the outside pharmacy. Trost also noted on November 11, 2015, that Humira was discontinued. As a

result, Trost prescribed Cimzia injections to be given every two weeks for weeks 0, 2, 4 and then every four weeks thereafter.[3] Trost also prescribed Phenergan (medication to treat nausea and vomiting or allergies). In this case, Humira was deemed non-formulary, so Cimzia was prescribed as an alternate.

On November 13, 2015, Thompson was admitted to the infirmary for a 23-hour observation for complaints of vomiting and having loose stools. The RN gave Thompson an IV. Trost admitted him to the infirmary for an exacerbation of Crohn's disease based on Thompson having nausea, vomiting, and diarrhea for two days. Trost examined Thompson and found that Thompson appeared acutely ill and that his abdomen was soft with mild tenderness. The next day, Dr. Caldwell discharged Thompson from the infirmary finding that his flare-up came under control almost immediately and that it was likely caused by viral gastroenteritis that was self-limiting. Dr. Caldwell noted that Thompson was given IV fluids and Sulfasalazine and no further treatment was needed.

A doctor completed a jacket review of Thompson's chart on November 19, 2015 and prescribed Vitamin C and a daily multivitamin for one year.

On November 21, 2015, Thompson received his first set of Cimzia injections (2 injections of 200mg). Trost saw Thompson three days later. Trost noted that Thompson was tolerating his medication well and that Thompson had three semi-formed daily bowel movements with no abdominal pain. Trost tapered the Prednisone to 10mg for one

---

[3]     Cimzia is a similar biologic medication to Humira and Remicade.

week then 5mg daily for two weeks and then discontinued Prednisone. Trost also prescribed a diet order for Thompson for a high sugar snack for six months. On December 6, 2015, Thompson received his second set of Cimzia injections. On December 20, 2015, Thompson received his third set of Cimzia injections.

On December 21 and 28, 2015, Thompson was scheduled for the Nurse Practitioner Call Line ("NPCL") and Medical Doctor Call Line ("MDCL"), respectively, but was recalled because of a prison lockdown.

On January 16, 2016, Thompson received his fourth set of Cimzia injections. The next day, Dr. Caldwell saw Thompson for a post hospital admission follow-up and noted that Thompson had no major complaints, but there were some mild flare-ups that may have been from eating. Dr. Caldwell ordered follow-up as needed.

On January 24, 2016, Thompson stopped a nurse during medicine rounds and complained of a flare-up after not receiving his Sulfasalazine for two weeks. Thompson also reported abdominal pain and diarrhea. As such, the nurse scheduled Thompson for the next MDCL for evaluation. The next day, Trost saw Thompson for complaints of abdominal pain he had been having for two weeks. Thompson also reported having eight to ten bowel movements per day. Trost noted that Thompson had been doing well with Cimzia and Sulfasalazine until the Sulfasalazine ran out. Trost prescribed Sulfasalazine for one year and ordered a CBC, CMP and a follow-up appointment. That same day, Thompson had blood work done for CBC, CMP and erythrocyte sedimentation rate ("ESR") tests. The results showed that Thompson's Albumin, sed rate, and HGB levels

were outside of normal range. Thompson was scheduled for a follow-up appointment with Trost on February 2, 2016 to discuss the results.

When Thompson saw Trost on February 2, 2016, Thompson still complained that he was feeling poorly. Trost noted that Thompson's HGB level was 8.9 with the normal range being 12.3 to 18.0, which means the oxygen level in Thompson's blood was low. Trost prescribed Ferrous Sulfate for three months, Prednisone 40mg for 10 days, blood work for a CBC in a month, and ordered Thompson to return for a follow-up in a week. A week later, Thompson saw Trost for the follow-up. Trost noted that his HGB level was 8.9, sed rate was 52, with normal range being 0 to 10, and Albumin level was 2.6, with normal range being 2.4-5.0. Trost also noted that Thompson had five loose bowel movements daily and left quadrant abdominal pain. Trost indicated that he would inform Collegial Review and ordered Thompson to return in seven to ten days.

Three days later, a nurse noted that Thompson refused his Cimzia injections. The nurse also noted that Thompson talked to Trost and discussed the side effects. During his deposition, Thompson could not recall refusing his Cimzia injections. Thompson also could not recall any of the alleged side effects of the medication. (Doc. 111-1, p. 13).

On February 18, 2016, Thompson saw Trost for complaints of nausea, vomiting, severe cramping, abdominal pain, and having a minimal stool for 24 hours. Trost indicated that Thompson's abdomen was distended with tenderness and guarding. Trost ordered Thompson to be sent to the hospital on an emergency medical furlough. At Memorial Hospital, Thompson received a CT scan that revealed stricture and soft tissue

thickening of the sigmoid colon. The scan also revealed fluid through Thompson's abdomen pelvis and mild thickening of the left superior urinary bladder wall. Thompson additionally had blood work done. On February 20, 2016, Memorial Hospital discharged Thompson with referrals to gastroenterology and to a colon rectal surgeon. That day, Thompson returned to Menard, and Trost gave telephone orders for Thompson to continue with his medications and return to the cell house.

On March 4, 2016, Thompson complained of a urinary tract infection, and the nurse referred him to a doctor. The next day, Thompson saw Dr. Caldwell who prescribed Milk of Magnesia, Fiberlax, and ordered a two-week follow-up.

On March 17, 2016, Thompson refused a physical examination. On March 20, 2016, Thompson walked out of nurse sick call after refusing to pay the co-pay and refusing to verbalize his medical complaints. On March 24, 2016, Dr. Butalid saw Thompson, prescribed a Prednisone dose pack, and ordered urinalysis.

On April 14, 2016, Thompson refused his Cimzia injections due to complaints of stomach discomfort. On April 19, 2016, Thompson again refused his Cimzia injections. That day, Trost noted that Thompson refused his Cimzia injections because according to Thompson, the side effects were intolerable with no benefit. Thompson complained that he had 10-15 watery bowel movements daily. Trost noted that Thompson just finished Prednisone and complained of abdominal pain with no vomiting. Thompson also had pneumaturia and a 30-pound weight loss. Trost admitted Thompson to the infirmary for evaluation and possible surgery for Crohn's disease with a probable colovesical fistula.

Trost referred Thompson to Collegial Review for general surgery.

On April 19, 2016, Thompson was sent to Memorial Hospital in Belleville, Illinois. On April 26, 2016, Thompson had the following surgical procedures: repair of colovesical fistula; subtotal colectomy; ileostomy; rigid cystoscopy with bilateral stent insertion; and bladder repair. The discharge instructions indicated that Thompson would receive a 2-piece ostomy appliance to ensure the stoma would shrink. Thompson testified that his surgery went well. (Doc. 111-1, p. 14).

On May 3, 2016, Thompson returned to Menard and was admitted to the infirmary until May 11, 2016. Trost ordered that Thompson continue his medications as prescribed by the hospital and undergo daily dressing changes. Thompson testified that he had no complaints regarding his infirmary stay after surgery or with his post-surgery medical treatment. (Doc. 111-1, p. 14).

On May 4, 2016, Trost referred Thompson to Collegial Review for a general surgery follow-up which was approved by Dr. Garcia. The next day, Trost indicated that Thompson returned from the hospital after his subtotal colectomy, ileostomy, and takedown of the colovesical fistula. Trost ordered Thompson to continue the same medications and have daily dressing changes. Trost examined Thompson and found that the stoma looked satisfactory. However, there was semi-purulent drainage, so Trost prescribed the antibiotic Levaquin for ten days.

On May 9, 2016, Thompson had blood work taken for a CBC and a urine sample for urinalysis. The blood work showed several levels out of normal range. Thompson was

scheduled to see his surgeon for a follow-up on May 11, 2016. On May 11, 2016, Thompson went out on the medical furlough for his follow-up.

On May 19, 2016, Thompson saw Trost. Trost noted that Thompson was feeling well and had an excellent post-surgery prognosis. Trost scheduled a two-week follow-up. On May 25, 2016, Trost referred Thompson to Collegial Review for a second general follow-up which Ritz approved. The next day, Trost saw Thompson and noted that Thompson's Crohn's disease was improving and under control. Trost granted Thompson a permit to shower on the gallery for one year.

On June 20, 2016, Trost saw Thompson and noted that Thompson had no complaints and that he had a good appetite. Further, Trost noted that Thompson's wound was satisfactory and that Thompson was having excellent post-surgery results and recovery. Trost ordered a three-month follow-up appointment.

Thompson testified that he did not believe that Remicade was the only medication that could treat his Crohn's disease. Thompson also did not believe that Remicade would cure his Crohn's disease, and he did not believe that Crohn's disease could be cured by current medical treatment. (Doc. 111-1, p. 11). Thompson also testified that his complaints against Trost and Ritz span from July 28, 2014 until April 18, 2016. *Id* at. p. 16. Thompson does not have any medical training. *Id*. at p. 3.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute

as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV. PROC. 56(a)). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, and as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014). The Court's role at summary judgment is not to evaluate the weight of evidence, to judge witness credibility, or to determine the truth of the matter. Instead, the Court is to determine whether a genuine issue of fact exists. *See Nat'l Athletic Sportwear Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

It is well established that "supervisory liability" or *respondeat superior* liability is not applicable in Section 1983 claims. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). Section 1983 requires proof of individual responsibility. *See Shields v. Ill. Dept. of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014). The Supreme Court has recognized that

deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-592. Second, the plaintiff must establish the individual prison officials were deliberately indifferent to that condition. *Id.*

The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)(citations omitted). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994)(violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm")(internal quotation marks omitted)(emphasis added)).

To show prison officials acted with deliberate indifference, a plaintiff must put forth evidence that prison officials not only knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *See Holloway v.*

*Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id. Accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)(stating that "[d]eliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)(stating that "negligence, even gross negligence does not violate the Constitution.").

Assessing the subjective prong is more difficult in cases alleging inadequate health care as opposed to lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit explained:

> By definition a treatment decision that is based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id*. (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)).

This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[] that [he] did." *Whiting*, 839 F.3d at 662 (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)(alterations in the original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment if the treatment is known to be ineffective but is chosen anyway. *See Berry*, 604 F.3d at 441. The Eighth Amendment does not require that

prisoners receive "'unqualified access to health care.' Rather, they are entitled only to "'adequate medical care.'" *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)(citations omitted).

Lawrence moves for summary judgment arguing the claims against him are barred by the doctrine of sovereign immunity. Trost, Ritz and Wexford move for summary judgment arguing that Thompson cannot set forth any evidence demonstrating that Trost and Ritz were deliberately indifferent to Thompson's serious medical needs or that Wexford had an unconstitutional policy, practice, or procedure. Thompson only filed an opposition to the summary judgment motion filed by Trost, Ritz, and Wexford. Thompson counters that Trost, Ritz and Wexford are liable because they were aware of the severity of his Crohn's disease, but persisted in the same form of treatment despite this knowledge. Thompson also argues that his condition continued to get worse and that it was not until his condition became life threatening that the Defendants changed their course of treatment. As the motions are ripe, the Court turns to the merits of the motions and addresses first the motion filed by Trost, Ritz and Wexford.

## ANALYSIS

Construing the evidence in the light most favorable to Thompson, the Court finds that he has not established that Dr. Trost or Dr. Ritz were deliberately indifferent to his medical needs regarding his Crohn's disease. The record reveals that Trost provided appropriate medical treatment to Thompson on countless occasions. For example, Dr. Trost routinely saw, examined, and prescribed medications for Thompson's Crohn's

disease. Trost ordered appropriate follow-ups as necessary and regularly accessed the course of treatment that was being provided for Thompson. Trost also referred Thompson several times for Collegial Review so that he could see a GI specialist. Trost additionally adjusted the course of treatment based on his own review and the examination and recommendation of the outside specialists. Trost furthermore promptly requested that Thompson be admitted to the hospital for emergency treatment and ensured that he received proper post-surgery care. Obviously, the treatment Thompson received was not the treatment Thompson wanted or demanded. However, mere disagreement or dissatisfaction as to the treatment received does not amount to deliberate indifference. *See Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). There is no evidence that either Trost or Ritz's medical decisions/treatment plans were such a substantial departure from accepted professional judgment, or so plainly inappropriate, as to permit the inference they intentionally or recklessly disregarded Thompson's serious medical needs. Rather, these doctors exercised their professional judgment and provided Thompson with Dr. McCain's recommended course of treatment, which included the use of a biologic agent subject to the approval of the correction facility (due to security concerns). When Humira was determined to be non-formulary, Cimzia, a similar biologic agent was approved as an alternate. Further, the medical records indicate that Thompson's condition only worsened to the point where he needed surgery *after* Thompson decided not to take

Cimzia, despite Trost's notation that Thompson tolerated Cimzia well. Thus, the Court finds that Thompson has not established that Dr. Trost or Dr. Ritz were deliberately indifferent to his medical needs.   As such, summary judgment is granted in favor of Trost and Ritz.

Thompson's claim against Wexford likewise meets the same fate. Wexford is a private corporation, but the Seventh Circuit held that the *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law. *See, e.g., Shields v. Ill. Dept. of Corr.*, 746 F.3d 782 (7th Cir. 2014)(noting that every circuit court that has addressed the issue has extended the *Monell* standard to private corporations acting under color of state law). To prevail on his *Monell* claim, Thompson needs to show that Wexford's policy, practice, or custom, caused a constitutional violation. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). However, as previously discussed, there is no evidence of an underlying deliberate indifference for the treatment of Thompson's Crohn's disease. Without any evidence of deliberate indifference regarding Thompson's treatment, Wexford cannot be held liable for damages on Thompson's *Monell* claim. *See Pyles*, 771 F.3d at 411 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571 (1986)).

Furthermore, Thompson has not demonstrated that there were any Wexford policies that existed, which served to deny care for Thompson's Crohn's disease. In fact, Thompson testified that he gained the information about Wexford's alleged policies from the inmate who prepared his complaint. (Doc. 111-1, p. 19-20). Specifically, he testified:

Q.      Okay. So in your Complaint you write that Wexford Health
        Sources, Inc. is also named as a Defendant because they are
        liable for having policies, procedures, and practices in place
        that emphasize the minimization of monetary expenditures
        over access to the medical care for serious medical needs.

A.      Correct.

Q.      Where did you get this information?

A.      The guy that wrote my Complaint wrote that down.

Q.      Okay, so this was based off of what he believes?

A.      Yes.

Q.      And prior to the guy helping you write this down, do you have
        any, did you have any information regarding such policies,
        practices, or procedures?

A.      None whatsoever.

Q.      Okay. And then you continued saying, and also for having
        policies, procedures and practices in place that interfere with
        appropriate courses of treatment by creating a standard of
        monitoring an illness, resulting in the unnecessary
        prolongment of suffering until a condition becomes life-
        threatening. Is this also what this guy wrote, or

A.      Yes.

Q.      -- do you – yes? And did you have any information regarding
        this policy, practice of procedure –

A.      No.

Q.      -- before that? No?

A.      No.

*Id.* Additionally, Thompson noted that he could not recall any specific Wexford policy

with which he had an issue. *Id.* at p. 20. Based on the record, Thompson has not demonstrated the existence of any Wexford policy that served to violate his constitutional rights.

Lastly, as the Court found in favor of Trost, Ritz and Wexford, the Court need not address the merits of Lawrence's summary judgment motion. The finding in favor of those Defendants on Thompson's claims moots the claim against Lawrence as Thompson is not entitled to injunctive relief.

### Conclusion

Accordingly, the Court **FINDS as moot** Defendant Lawrence's motion for summary judgment (Doc. 106) and **GRANTS** the motion for summary judgment filed by Trost, Ritz and Wexford (Doc. 110). The Court finds in favor of John Trost, Stephen Ritz, Wexford Health Sources, Inc., and Frank Lawrence against Michael Thompson. Further, the Court **DIRECTS** the Clerk of the Court to enter judgment reflecting the same and close the case. Thompson shall take nothing from this case.

**IT IS SO ORDERED.**

**Dated:   June 1, 2020.**

Digitally signed
by Judge Sison
Date: 2020.06.01
12:59:38 -05'00'

_____

**HON. GILBERT C. SISON**
**United States Magistrate Judge**